# UNITED STATES DISTRICT COURT
# EASTERN DISTRICT OF WISCONSIN

**UNITED STATES OF AMERICA**
        **Plaintiff,**

    v.                                     **Case No. 09-CR-24**

**JERMAINE COLEMAN**
        **Defendant.**

## DECISION AND ORDER

The government charged defendant Jermaine Coleman with possessing a firearm as a felon, contrary to 18 U.S.C. § 922(g). Defendant moved to suppress statements he made to law enforcement officers following a traffic stop, arguing that the officers failed to provide <u>Miranda</u> warnings before questioning him. He also moved to suppress the firearm, which the officers recovered based on his admissions, as fruit of the unlawfully obtained statements. The magistrate judge handling pre-trial proceedings in the case held a hearing, then issued a recommendation that the motion be denied. Defendant objected, but on de novo review pursuant to Fed. R. Crim. P. 59(b)(3) I concluded that defendant was not in custody at the time he made the statements and thus not entitled to <u>Miranda</u> warnings. I therefore adopted the recommendation and denied the motion.

Defendant subsequently sought, and I granted, permission to file a second motion to suppress, this time challenging his post-arrest statements under <u>Miranda</u> and <u>Killebrew v. Endicott</u>, 992 F.2d 660 (7th Cir. 1993). The parties stipulated to the pertinent facts, provided the court with a CD of the recorded interviews at issue, and agreed that the motion could be resolved without a hearing.

**I. FACTS**

On October 15th, 2008, at approximately 5:10 p.m., Milwaukee Police Department Detectives Scott Marlock and David Lopez pulled defendant over for a traffic violation. After determining that defendant had a revoked driver's license, the detectives asked defendant to exit the vehicle. The detectives then advised defendant that they had information that he sold drugs and possessed a pistol. Defendant allowed the officers to search his person and car, which revealed no contraband. Marlock then told defendant that he had information that defendant possessed drugs and a pistol in his apartment, and asked defendant for consent to search the apartment for guns or other contraband. Defendant asked if there was anything he could work out with the officers so he would not have to go back to jail. Marlock responded that depending on what they found in the apartment, it was possible that they could sit down and talk, but he could not promise anything. Defendant then admitted that he had a pistol in the apartment. After some further back and forth, defendant agreed to take the officers to his apartment, where the officers found a gun.[1]

At some point, the detectives also determined that defendant had a probation "hold," and they arrested and conveyed defendant to the Milwaukee Police Administration Building. At approximately 10:04 p.m., Marlock and Lopez went to the room where defendant was being held to interview him.

At the outset of the October 15 interview, which was recorded in its entirety and lasted

---

[1] I discussed the facts surrounding the stop and discovery of the gun in greater detail in my decision denying defendant's first motion to suppress. (R. 33 at 1-3.)

2

about twenty minutes, defendant immediately began to talk about his arrest.[2] As soon as the detectives entered the room and before they even addressed him, defendant said "there ain't no way out. I tied myself and its over with," and that no matter what he did the police were "going to put that gun on" him. (CD #1 of Interview at 0:45-:56.) He said he saw the officers with a "statement," to which Lopez responded defendant did not have to sign one, but he had to "write one out." Marlock said, "We told you we were going to talk to you about the gun." (Id. at 1:03.) Lopez also stated that "before we can move on to the next stage I have to talk to you about today." (Id. at 1:07.)

Defendant said that if the officers were getting a statement for the gun, then "charges were being brought." (Id. at 1:14.) Lopez replied, "That's not true." (Id. at 1:15.) Defendant then asked what the statement would be for and asked about a "guarantee" that he would not get a new case. The detectives responded that there "is no guarantee." (Id. at 1:37.) Defendant complained that he tried to cooperate and placed his life in the detectives' hands. (Id. at 1:48.) Marlock replied that defendant was not going to see his probation officer like he was supposed to, had put his life in his own hands and had "violated [him]self." (Id. at 1:54.) Marlock explained that defendant's probation officer had issued a warrant for defendant's arrest because defendant did not maintain visits. (Id. at 2:02.) Defendant responded that he was concerned about a whole new charge related to the gun, and that he could receive ten years on revocation of his supervision based on such a charge, plus a possible federal case because he was already a felon. Defendant said, "I feel like I'm fucked. Either way I go, I'm

---

[2]Because the officers never got to the point of asking defendant directly about the gun, the interview did not proceed in a traditional question/answer format, and the participants at times talked over one another.

3

fucked. I mean, I took you all to it . . . There's no way out, I'm trapped. . . . No matter what I tell you all, . . . I'm not going to get out of that gun." (Id. at 2:24-2:42.) He complained that when he gave officers a gun in the past, they let him go. Lopez said that if he didn't have a probation hold he could have gone home that day. (Id. at 2:55.) Marlock reiterated that defendant was there because of the probation hold.

Marlock further stated that the officers were going to talk to defendant about the gun that was found in his apartment. "We have to talk to you about it, that's mandatory." (Id. at 3:14.) Whether they charged defendant with the gun or not, Marlock said, it was still mandatory that they talk to him about it. (Id. at 3:20.) "That's why we're in here, to talk to you about the gun that was in your apartment." (Id. at 3:26.) Lopez remarked that defendant had already told the officers about the gun, making the interview "overkill anyway, we're just doing it because we have to do it, this portion of it, officially." (Id. at 3:36.)

Marlock continued that defendant had previously told the officers he wanted to cooperate, and that is why they needed to talk to him, to build up credibility. (Id. at 3:51.) Defendant complained that he had cooperated up to now, and stated that once the officers read him his rights "everything was off the table. . . . Whatever I say is going to be used against me." Lopez said that, according to the Miranda rights, anything he said "can be used against him," not that it "has to be." (Id. at 4:32.) Marlock stated that everything defendant said to them that night could be used against him, whether he was read his rights or not. (Id. at 4:40.) Defendant stated that he felt "the more I talk, the more shit on me. . . . It seems like I'm putting myself in a predicament where I'm out of here. I'm through." (Id. at 5:03.) Defendant said that he had no proof that he would not get a gun charge. Lopez said, "We told you we couldn't guarantee you that." (Id. at 5:11.) Marlock said the detectives told defendant "from the get-go,

4

there was no guarantee." (Id. at 5:14.) The detectives said they were trying to talk to defendant about cooperation.

Lopez then said, "If you cooperate you get consideration for what you do." (Id. at 5:24.) Defendant asked, "What do you mean?" (Id. at 5:25.) Marlock explained that if defendant cooperated, they would tell the DA, who would decide how much consideration defendant would get, and that while there were no guarantees, in his experience defendants received consideration. (Id. at 6:19.) Marlock said he was "not in the habit of screwing people over once they cooperated." (Id. at 6:25.) Marlock said they could also tell defendant's PO that he cooperated. (Id. at 6:35.) Lopez said they would tell the DA and defendant's PO and lawyer that he cooperated because they had to. (Id. at 6:52.) Defendant responded that he had been through this (i.e., cooperation) before. (Id. at 7:09.) The detectives asked what defendant did, and defendant replied that he told officers about a drug dealer, but he still "got fucked." (Id. at 7:30.) Defendant also said, again, that in the past when he gave officers a gun the DA was not involved. (Id. at 7:42.) He continued that he had a bad record, and that his life was over. He said he didn't "know what to do." (Id. at 8:46.) He said that the officers wanted others, which was "no problem," but by talking about a gun it was "like basically admitting it, and I'm not [going to] do that." (Id. at 9:08.) He also again stated that he had ten years hanging over his head, and that a gun case could cause him to serve the entire term, plus the sentence on the new case. "If I'm fucked anyway, why talk?" (Id. at 9:32.) He indicated that he had been in the system since age thirteen, and that if he talked any further about the gun, "I'm incriminating myself." (Id. at 10:09.)

Marlock stated: "I'm not going to ask you any questions about the gun right now, because I haven't Mirandized you yet," but that defendant "had already been incriminated as

5

to the gun. . . . You've already acknowledged that you knew about the gun. You directed us to the gun." (Id. at 10:42.) Defendant tried to speak, and Marlock said, "hold on," the detectives would advise him of his rights and then ask questions "relative to why [he] had the gun." (Id. at 10:51.) Marlock suggested that there was something in defendant's life that caused him to posses it. Defendant said that questions about "why" would be like "admitting." (Id. at 11:09.) The detectives responded that defendant had already admitted the gun, leading them right to it. Marlock said "this is your explanation." (Id. at 11:23.) Defendant said he had no explanation other than he took the officers to it because he was under the impression he was going to go free. (Id. at 11:36.) The detectives responded that they made no such promise. (Id. at 11:43.) Defendant stated that he should have made the officers get a warrant. He said: "I'm fucked. . . . And I'm not [going to give] a statement to help fuck me more." (Id. at 12:17.) He continued that the officers could not convince him that he would not be charged, and that a DA would take one look at his record and see that he was a "career criminal." (Id. at 12:51.) He continued to complain for about two minutes, stating that it may be his lot to spend his life in prison. The officers did not address him during this time. (Id. at 12:52-14:05.)

Marlock then interrupted and said, "Just stop talking for a second." (Id. at 14:10.) He said that whatever defendant decided to do was his choice; if he did not want to make a statement, it was up to him, but defendant had said he wanted to cooperate earlier, which was why they were having the meeting. (Id. at 14:26.) He said that if defendant wanted to work with them, they had to talk about the gun, which was why they were there, to talk about the gun. (Id. at 14:36.) Marlock told defendant that they were still willing to work with him, but they were under time constraints because of his probation status. He also stated that they had no choice but to arrest him because there was a probation hold on him. He said defendant should

6

have been forward with them from the beginning about his probation status. (Id. at 15:04.) Defendant asked what difference that made. (Id. at 15:08.) Lopez explained that if defendant did not have the probation hold, he might not have been arrested; officers generally have discretion as to whether or not to arrest, but not when the suspect had a probation hold. (Id. at 15:26.)

Defendant again stated that he thought the gun was being confiscated, like on previous occasions, where officers took the gun and then let him go. (Id. at 15:53.) Lopez, seemingly frustrated, said "You don't get it, do you." (Id. at 16:02.) Lopez again explained that the difference between this instance and prior situations where defendant cooperated and was released was the probation hold. (Id. at 16:33.) Defendant said, "either way, I'm fucked," and again mentioned that he had ten years hanging over his head. (Id. at 17:42.) Lopez then asked, "wouldn't you do something to lessen that?" (Id. at 17:45.) Defendant replied, "ain't no way I'm lessening that." (Id. at 17:47.) Lopez said, "You're wrong." (Id. at 17:49.) Defendant said he didn't care about that. (Id. at 18:02.) Lopez asked if doing twenty or ten made a difference. (Id. at 18:07.) Defendant said any time is too much. (Id. at 18:21.) He said: "I fucked myself basically. . . . I guess it was my time and it was meant to be. I fucked myself by telling y'all and taking y'all to that gun. I should have just let y'all get the shit on your own basically." (Id. at 18:45.) He complained that he threw his life away. (Id. at 18:55.) "There's no need for me to say anything else. Y'all got enough already. I took y'all to it. Y'all don't need no more from me. . . . I feel like there ain't no more for me to talk about." (Id. at 19:25.) He then said my "life is over with" and again discussed his prison record. He told the officers to just send him to county, there was nothing he could do. "I don't feel that you all can help me, at all." (Id. at 19:58.) The detectives then suspended the interview at approximately 10:25 p.m.

7

(Id. at 20:03-:34)

The following morning, October 16, Lopez met defendant and advised him of his Miranda rights. Defendant said he wanted to remain silent, and the interview terminated. (CD # 2.)

## II. DISCUSSION

### A. Applicable Legal Standards

In order to safeguard the right against self-incrimination, the police must advise a person of certain rights prior to subjecting him to custodial interrogation. Miranda v. Arizona, 384 U.S. 436, 444 (1966). To implicate Miranda, the person must be both "in custody" and subject to "interrogation." United States v. Yusuff, 96 F.3d 982, 987 (7th Cir. 1996). Unlike defendant's first motion, which implicated the "in custody" requirement (R. 33 at 4-6), the instant motion requires me to determine whether defendant was "interrogated" on October 15, prior to the provision of warnings.

Interrogation is defined as "either express questioning or its functional equivalent." Rhode Island v. Innis, 446 U.S. 291, 300-01 (1980). Thus, for purposes of Miranda, interrogation includes both direct questions and "any words or actions on the part of the police (other than those normally attendant to arrest and custody) that the police should know are reasonably likely to elicit an incriminating response from the suspect." Id. at 301. The "test is whether a reasonable objective observer would have believed that the law enforcement officer's statements to the defendant were reasonably likely to elicit an incriminating response." United States v. Hendrix, 509 F.3d 362, 374 (7th Cir. 2007). The proper focus is primarily upon the perceptions of the suspect, rather than the intent of the police. Whitehead v. Cowan, 263

F.3d 708, 718 (7th Cir. 2001).

A police officer's response to an inquiry by the suspect does not constitute interrogation. Hendrix, 509 F.3d at 374 (citing United States v. Briggs, 273 F.3d 737, 740 (7th Cir. 2001)). Nor are voluntary statements or statements angrily yelled in response to an arrest subject to suppression under Miranda. See id.; United States v. Mills, 122 F.3d 346, 350-51 (7th Cir. 1997). Statements are deemed volunteered when they are not the result of "compelling influences, psychological ploys, or direct questioning." Hendrix, 509 F.3d at 374 (citing Arizona v. Mauro, 481 U.S. 520, 529 (1987); United States v. Jackson, 189 F.3d 502, 510 (7th Cir. 1999)); see also United States v. Cooper, 19 F.3d 1154, 1162 (7th Cir. 1994) ("The question of which party encouraged the dialogue between the police and the accused plays an indicative role in the determination of whether the statement was the result of compelled influence.").

The Seventh Circuit has found the functional equivalent of interrogation where a police officer told a defendant who had not been advised of his Miranda rights that he would inform the district attorney of any cooperation the police received from the defendant. Killebrew, 992 F.2d at 663. But the court of appeals has also held that briefly reciting to a suspect in custody the basis for holding him, or explaining the evidence against him, without more, is not the functional equivalent of interrogation. Enoch v. Gramley, 70 F.3d 1490, 1500 (7th Cir. 1995); see also Easley v. Frey, 433 F.3d 969, 974 (7th Cir. 2006) (holding that an officer's statement regarding the evidence and the possible consequences of the charges the defendant faced did not amount to interrogation, and noting that the provision of such information may contribute to the intelligent exercise of judgment regarding what course of conduct to follow).

**B. Analysis**

Defendant argues that the detectives functionally interrogated him when Marlock said,

9

"we told you we were going to talk to you about the gun," and that it was "mandatory" they talk to him about it, and when Lopez told him that the detectives would advise the DA of any cooperation and that defendant would likely get consideration for his cooperation. Because the detectives made similar statements at various points during the interview, and because defendant spoke about a variety of matters (some of which may not be relevant or admissible for other reasons), I asked the government to identify the specific statements it intended to use in its case-in-chief at trial. On careful review of the recording under the standards set forth above, I conclude that defendant's motion should be granted in part and denied in part.[3]

As indicated in the fact section above, defendant made an unsolicited statement as soon as the detectives entered the interview room. Specifically, he said "there ain't no way out. I tied myself and its over with," and that no matter what he did the police were "going to put that gun on" him. (CD #1 of Interview at 0:45-:56.) This volunteered statement is not subject to suppression under Miranda. See Hendrix, 509 F.3d at 374.[4]

Defendant then made a comment about seeing a "statement," and Lopez responded that defendant did not have to sign one, but he had to "write one out." Marlock said, "We told you we were going to talk to you about the gun." (Id. at 1:03.) Lopez also said that "before we can move on to the next stage I have to talk to you about today." (Id. at 1:07.) Defendant contends that these statements amounted to interrogation: Lopez's comment about not having

---

[3]I make specific findings below regarding the statements the government expressed an intent to use.

[4]While defendant argues that all of the statements identified by the government should be suppressed, he provides no specific basis for excluding this volunteered statement. He does in his reply brief discuss the time-line, pointing out that the interview occurred five hours after his arrest, but he makes no argument that this requires suppression.

10

to sign a statement was intended to minimize the potential effect of any admission,[5] and implicit in Lopez's comment about getting to the "next stage" was a requirement that defendant first talk about the gun. However, I conclude that the detectives were, at this point, merely responding to defendant and explaining why they were there. See Enoch, 70 F.3d at 1500; United States v. Payne, 954 F.2d 199, 201-02 (4th Cir. 1992). The detectives' comments must also be understood in context: defendant had previously expressed a desire to cooperate and was at the time questioning why the officers were obtaining a statement about the gun. The detectives' response to his question is not problematic under Miranda.

Defendant then expressed concerns about "charges" and asked for a "guarantee" that he would not get a new case. The detectives properly responded that there was no guarantee. This response fits well within the holding of Easley, 433 F.3d at 974, that statements of this sort may contribute to the intelligent exercise of judgment regarding what course of conduct to follow. Defendant complained that he tried to cooperate and still got arrested, and Marlock replied that defendant had been arrested because of a probation hold. Advising a suspect why he is in custody does not constitute interrogation. See Enoch, 70 F.3d at 1500. Defendant responded that he was concerned about a new charge related to the gun and the length of a possible sentence after revocation. He then said: "I feel like I'm fucked. Either way I go, I'm fucked. I mean, I took you all to it . . . There's no way out, I'm trapped. . . . No matter what I tell you all, . . . I'm not going to get out of that gun." (Id. at 2:24-2:42.) Because this statement was not made in response to interrogation by the officers, it need not be suppressed.

Thereafter, however, the officers engaged in the functional equivalent of interrogation.

---

[5] He also notes that his signature was unnecessary because the interview was being recorded.

11

Just past the three minute mark of the interview, Marlock stated that they were going to talk to defendant about the gun that was found in his apartment. "We have to talk to you about it, that's mandatory." (Id. at 3:14.) "That's why we're in here, to talk to you about the gun that was in your apartment." (Id. at 3:26.) Lopez added that defendant had already told the officers about the gun, making the interview "overkill anyway, we're just doing it because we have to do it, this portion of it, officially." (Id. at 3:36.) Marlock continued that defendant had previously told the officers he wanted to cooperate, and that is why they needed to talk to him, to build up credibility. (Id. at 3:51.) These statements – that it was "mandatory" they talk about the gun, and that in order for defendant to cooperate they needed to talk to "build up credibility" – are reasonably likely to elicit an incriminating response. Nor can these statement be reasonably construed as mere responses to defendant's questions or complaints. Marlock's statements in particular, in discussing the need to build up credibility in order to cooperate, did not respond to anything defendant said; rather, he seemed to be taking the interview in a different direction at that point. Therefore, defendant's statement that he had "cooperated up until now" (id. at 4:01) may not be used in the government's case-in-chief.[6]

Likewise, the detectives' statements about the Miranda rights – that anything defendant said "can be used against him," not that it "has to be" (Id. at 4:32), and that everything defendant said to them that night could be used against him, whether he was read his rights or not – can be considered reasonably likely to elicit an incriminating response. Specifically, these statements can reasonably be understood as discouraging defendant from exercising

---

[6]The government indicates that this statement – number 3 on its list – begins with "I told you there was a gun." (R. 45 at 2.) On listening to the CD several times, I cannot discern these words.

12

his right to remain silent at that point and encouraging him to continue talking. Therefore, defendant's statement that "the more I talk, the more shit on me. . . . It seems like I'm putting myself in a predicament where I'm out of here. I'm through." (id. at 5:03) will be suppressed from use in the government's case-in-chief.

Between the five and ten minute marks, the detectives discussed cooperation with defendant. In particular, Lopez said, "If you cooperate you get consideration for what you do." (Id. at 5:24). After defendant asked what that meant, Marlock explained that if defendant cooperated, they would tell the DA, and that while there were no guarantees, in his experience defendants received consideration. (Id. at 6:19.) Marlock said they could also tell defendant's PO that he cooperated. (Id. at 6:35.) In Killebrew, the Seventh Circuit:

> found the functional equivalent of interrogation where a police officer told a defendant who had not been advised of his Miranda rights that he would inform the district attorney of any cooperation the police received from the defendant. A reasonable objective observer would have expected the officer's invitation for the suspect to help himself by cooperating to elicit an incriminating response.

Enoch, 70 F.3d at 1500. The same is true here. I therefore find that defendant's statement at the end of this colloquy – that if he talked any further about the gun, "I'm incriminating myself" (Id. at 10:09) – must be suppressed.

At about the 10 ½ minute mark, Marlock stated: "I'm not going to ask you any questions about the gun right now, because I haven't Mirandized you yet," but that defendant "had already been incriminated as to the gun. . . . You've already acknowledged that you knew about the gun. You directed us to the gun." (Id. at 10:42.) Defendant tried to speak, and Marlock said, "hold on," the detectives would advise him of his rights and then ask questions "relative to why [he] had the gun." (Id. at 10:51.) Marlock also suggested that there was something in defendant's life that caused him to posses it. The government argues that Marlock was

13

actually discouraging defendant from speaking here, but the context of his entire statement to defendant suggests otherwise.  Marlock's statement is reasonably construed as encouraging defendant to explain why he possessed the gun, perhaps because of some danger or event in his life.  Defendant responded that questions about "why" would be like "admitting." (Id. at 11:09), to which the detectives responded that defendant had already admitted the gun, leading them right to it.  Marlock said "this is your explanation." (Id. at 11:23.)  Inviting an in-custody defendant to explain why he allegedly committed a crime is reasonably likely to elicit an incriminating response.  Therefore, defendant's response – that he had no explanation other than he took the officers to it because he was under the impression he was going to go free (Id. at 11:36) – may not be used in the government's case-in-chief.[7]  After the detectives responded that they made no such promise, defendant stated: "I'm fucked. . . . And I'm not [going to give] a statement to help fuck me more." (Id. at 12:17.)  Because this statement followed directly on the heels of the functional interrogation discussed above, it must be suppressed.

Defendant then complained about his situation for about two minutes, after which Marlock interrupted and said, "Just stop talking for a second." (Id. at 14:10.)  He said that whatever defendant decided to do was his choice, but that if defendant wanted to work with them, they had to talk about the gun. (Id. at 14:36.)  He also stated that although the detectives were still willing to work with him, they were under time constraints because of defendant's probation status.  After a discussion about the import of defendant's probation status and about past occasions when defendant gave the police a gun, defendant again said

---

[7]This is not, in any event, one of the statements the government intends to use.

14

that he was "fucked" and had ten years hanging over his head. (Id. at 17:42.) In response, the detectives again encouraged defendant to cooperate. Lopez asked, "wouldn't you do something to lessen that?" (Id. at 17:45.) Defendant answered, "ain't no way I'm lessening that" (Id. at 17:47), to which Lopez replied, "You're wrong." (Id. at 17:49.) Defendant said he didn't care about that. (Id. at 18:02.) Lopez asked if doing twenty or ten made no difference. (Id. at 18:07.) Defendant then said that any time is too much and that: "I fucked myself basically. . . . I guess it was my time and it was meant to be. I fucked myself by telling y'all and taking y'all to that gun. I should have just let y'all get the shit on your own basically." (Id. at 18:45.) He continued: "There's no need for me to say anything else. Y'all got enough already. I took y'all to it. Y'all don't need not more from me. . . . I feel like there ain't no more for me to talk about." (Id. at 19:25.) Because these statements came in response to the detectives' encouragement that defendant cooperate to try to lessen his prison exposure, I will suppress them from use in the government's case-in-chief under Killebrew.

## III. CONCLUSION

**THEREFORE, IT IS ORDERED** that defendant's motion to suppress (R. 39) is **GRANTED** in part and **DENIED** in part. Specifically, while the government may use statements 1 and 2 set forth in its October 8, 2009 filing, it may not use statements 3-8 in its case-in-chief.

Dated at Milwaukee, Wisconsin, this 16th day of February, 2010.

/s Lynn Adelman

_____
LYNN ADELMAN
District Judge

15